IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2021

## STATE OF TENNESSEE v. SEAN MITCHELL A.K.A. ANTWON RAINER

**Appeal from the Criminal Court for Shelby County**
No. 15-03420    Lee V. Coffee, Judge
_____

### No. W2020-01488-CCA-R3-CD
_____

Defendant, Sean Mitchell A.K.A. Antwon Rainer, was indicted for rape and aggravated kidnapping, and a jury convicted Defendant as charged. The trial court sentenced Defendant, pursuant to the repeat violent offender statute, to two life sentences without the possibility of parole and ran the sentences consecutively. On appeal, Defendant argues (1) that the trial court erred by admitting hearsay evidence, (2) that the chain of custody for Defendant's penile swabs was not properly established, (3) that the evidence was insufficient to support the convictions, and (4) that the trial court erred by imposing excessive sentences. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Shae Atkinson, Memphis, Tennessee, (on appeal), and Edwin C. Lenow, Memphis, Tennessee, (at trial), for the appellant, Sean Mitchell A.K.A. Antwon Rainer.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree and Austin Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

This case arises from the aggravated kidnapping and rape of the victim, N.C.[1] Defendant forcibly pushed the victim into his truck in the early morning hours of April 17,

---

[1] It is the custom of this court to refer to victims of sexual offenses by their initials.

2015. His truck's passenger door did not have a handle, so the victim was trapped. Defendant took the victim to his apartment where he raped her orally and vaginally. The victim escaped and ran naked down the street, trying to flag down two different cars for assistance. She was on the phone with 9-1-1 at the same time. Police arrived, and the victim assisted them in locating Defendant.

*Trial*

State's Proof

Norman Kelly testified that he was living in the Fieldstone Apartments in Memphis in April of 2015. Early in the morning of April 17, 2015, Mr. Kelly got ready for work and left the apartment complex in his car. He waited for a car to pass him, and he proceeded to turn onto Hacks Cross. The car ahead of him swerved sharply. Mr. Kelly then realized that the other car swerved because "a young lady had jumped in front of [the] car[.]" He stated that the lady tried to wave him down, acted "kind of frantic," and did not have any clothing on. Mr. Kelly did not stop, but he did call 9-1-1 because he was under the impression that the woman was fearful or trying to get away from something. Mr. Kelly testified that he only saw the woman for a couple of seconds but long enough to remember that he "almost hit somebody." He stated that he did not stop because he had to get to work, and he did not want to put himself in the middle of a "unique situation." Mr. Kelly's 9-1-1 call was played for the jury. The 9-1-1 call reflected that he did not tell the operator that the woman had no clothing, but at trial, he remembered that she was not wearing any clothes. When asked to identify the woman, he pointed to the victim.

The victim testified that she was living in Memphis in April of 2015. She was married but did not have any children. She stated that, on the evening of April 16, 2015, she had sexual relations with her husband. In the early morning hours of April 17, 2015, she left a card game at a friend's house and walked by herself to the store to get cigarettes. She stated that the store was one street over from where she was playing cards.

The victim testified that she heard someone from behind her saying, "Hey, little mama. Come here." She kept walking and did not turn around at first, and she did not recognize the voice. She heard the voice again, saying, "Hey, little mama. I know you hear me." Still, she kept walking. The victim then heard a car stop, so she turned around. The victim saw Defendant step outside his tan truck about ten feet from her. She had never seen Defendant or his vehicle before. Defendant began coming toward her. The victim said that she "took off running[,] and [Defendant] ran behind [her] and he grabbed [her]

- 2 -

from behind." The victim explained that Defendant grabbed her around her neck and told her that "if [she] screamed or made any noise that he was going to snap [her] neck."

The victim stated that Defendant put her in his truck, told her his name was "Sean," and stated that she was going to be his girlfriend. The victim said that she tried to get out, but the passenger side door would not open from the inside. Defendant began driving and told the victim that they were going to go to his brother's house. Defendant also told the victim that he had been incarcerated for murder for "16 years in the penitentiary" and that he was "not afraid to go back."

The victim testified that she had her phone in her pocket but that the battery was dead. They stopped at Defendant's brother's apartment complex. After Defendant parked, he opened the passenger door from the outside, put his arm around the victim's neck again, covered her mouth, and dragged her into the apartment. Inside, the victim saw a person, whom Defendant identified as his nephew, lying asleep on the living room floor. After Defendant and the victim entered the apartment, Defendant pushed the victim through a bathroom and into an attached bedroom.

The victim testified that Defendant told her to "go and take a shower." However, Defendant quickly changed his mind and pulled her back into the bedroom by her neck. The victim stated that Defendant "ripped [her] clothes and told [her] to lay on the bed." The victim asked Defendant to place her phone on the charger, and he did.

The victim testified that Defendant pushed her on the bed, pulled her pants off, got on top of her, and put his fingers inside of her vagina. She then asked Defendant to stop and to let her go, but he ignored her. Defendant put on a condom and got on top of her again. The victim stated that Defendant put his penis inside of her vagina. Defendant also demanded that the victim perform oral sex. He grabbed the victim's head, pushed her to his penis, and "put it in [her] mouth." She agreed that the assault lasted "a long time."

The victim stated that Defendant's penis was large and that it caused physical pain. At one point, they were interrupted by someone beating on the door. The victim assumed that it was Defendant's nephew. She recalled the person asking what was going on in the bedroom and if everything was "all right." The victim replied, "No, he won't leave me. He won't get off of me. He won't let me go." Defendant then replied, "It's all right. I got it. We straight." The other person then left the door.

The victim stated that, after the interruption at the door, Defendant stopped and told her to take a shower. The victim asked Defendant if she could take her phone so she could listen to music while she was in the shower. The victim testified that she actually wanted

her phone because she knew that the front door of the apartment was right outside the bathroom and that she could run away and call for help. Defendant gave her the phone.

The victim stated that she grabbed her phone and her clothes but was still naked when she entered the bathroom. She stated that she turned the shower water on but that she did not take a shower. Instead, she ran out of the bathroom door and went outside. The victim was still naked when she ran outside, and she had her clothes and phone in her hand. She stated that it was early morning hours and still dark outside. She began flagging down cars for help and called 9-1-1 at the same time. She recalled seeing two cars driving on the road, but neither stopped, even though one car almost hit her.

The victim stated that she did not stop to put her clothes on because she noticed Defendant following her outside in the truck. She recognized Defendant's truck from earlier, and she recognized Defendant in the driver's seat because of his tattoos. Defendant's truck got closer than five feet from her, but he did not get out of the truck. The victim was still on the phone with the 9-1-1 operator while Defendant was getting close to her. The victim then ran across the street and hid behind a tree. Once she was hiding, she saw his truck going up and down the street, but he never got close to her again.

The victim stayed on the phone with the 9-1-1 operator and waited for police to arrive. She put on her pants but not her ripped shirt. She stated that, when the police pulled up to the apartments, she ran to them and told them what happened. She got into the police car, and they drove around the apartments, but she did not see Defendant or the truck at that time. However, on the way out of the apartments, she saw Defendant sitting in his truck at the entrance gate, and she identified him for the police. The victim stated that Defendant acted like he was asleep in the truck. The police went to Defendant's truck and pulled him out of the truck. The victim's 9-1-1 call was played for the jury.

The victim testified that the police took her to the Rape Crisis Center. She told the examiners what happened, and they performed an exam. She gave the doctors her clothes, which they put in a bag. She stated that the exam was similar to a regular gynecological examination, except that it hurt more and they took pictures. She stated that her neck was also hurting.

The Rape Crisis Center examiners asked her about recent sex with her husband and any medications she was taking at that time. She stated that she was using an inhaler for asthma and had been previously diagnosed with bipolar disorder when she was ten years old. She was not taking medication for bipolar disorder at the time of the offense. She stated that, in the prior five to ten years, no doctor had told her she needed medication for bipolar disorder, she had not been institutionalized, she did not have problems working, and she did not have problems with her mood, fatigue, or forgetfulness.

- 4 -

The victim identified the pants that Defendant wore while in the apartment, described as red, black, and white "checkerboard" pajama pants, and stated that they were the same pants he wore when the police removed him from his truck. She also identified a pair of shoes as the shoes she saw in the apartment and later saw Defendant wearing when he was arrested. The victim stated that she read and understood the lineup instructions the police gave her before identifying Defendant in a photographic lineup. She testified that she was able to immediately identify Defendant as the perpetrator. The victim also identified Defendant during a preliminary hearing and another previous proceeding[2] as the person who committed the offenses on April 17, 2015.

She was able to go home around 5:30 in the afternoon, after she was finished with both the Rape Crisis Center and the police. She testified that she had nightmares, could not sleep at night, and did not want her husband to touch her following Defendant's assault. She stated that the incident "ruined [her] marriage" and "ruined [her] life." She testified that she did not feel safe leaving the house and did not do so for about three years. Once she started leaving the house, she carried a pocketknife for protection.

On cross-examination, the victim stated that, when Defendant first approached her outside the gas station, she did not yell out or try to run back to the gas station. She agreed that, when she and Defendant first arrived at the apartment complex, she did not try to lock the doors to the truck when Defendant exited the vehicle and that she did not try to yell out to a woman who was walking her dog nearby. The victim recalled that, when Defendant first abducted her, he was wearing jeans and that, once he was at the apartment, he changed into the pajama pants. She stated that, when Defendant put on a condom, he was not wearing any clothes. The victim also testified that, during an incident unrelated to this case, she stabbed a man with a knife.

Memphis Police Department ("MPD") Sergeant Dekevious Kinsler testified that he was working the Ridgeway Station patrol night shift in April 2015. He recalled responding to a 9-1-1 call to Hacks Cross on April 17, 2015, regarding a "female black running in the area, naked and screaming." He stated that he was the first officer on the scene.

When Sergeant Kinsler arrived, he saw the victim without a shirt screaming and "very hysterical," saying that "somebody was following her and chasing her." Sergeant Kinsler put the victim in Officer Deshannon Beaty's police car, and the victim described that she had been picked up by a man, threatened, driven to an apartment, and forcibly raped. Sergeant Kinsler stated that he followed Officer Beaty, who drove the victim around

---

[2] The "previous proceeding" was Defendant's August 2019 trial on the present charges that ended in a mistrial because the jury could not reach a unanimous verdict. However, prior to the second trial, which is the subject of this appeal, the trial court instructed counsel not to refer to the first trial as a "trial" in front of the jury but rather as a "hearing" or "proceeding."

the apartment complex looking for the apartment or Defendant. Sergeant Kinsler testified, "When she couldn't remember exactly where [the apartment] was, we were about to drive out of the apartment complex and my partner radioed to me that the victim said that was the suspect's truck." Defense counsel objected to Sergeant Kinsler's statement on the grounds that it was hearsay, and the court overruled the objection. The trial court explained to the jury:

> [I]f it's not being offered for the truth of the matter asserted, then that statement can come in to show what effect it had on [Sergeant] Kinsler and what he did as a result of the information that he received. It's not being offered to say that's true, but of what he received and what he did when he received that information.

Sergeant Kinsler testified that he approached the truck and saw Defendant "l[y]ing there as if he [were] asleep." Defendant resisted as three or four officers "wrestled him out of the truck," "wrestle[d] him to the ground," and handcuffed him. Sergeant Kinsler testified that the suspect said his name was "Antwon Rainer."

MPD Officer Marijan Lovreta testified that he was on duty on April 17, 2015, and that he received a call to go to Fieldstone Apartments in the early morning. He stated that, when he arrived, he relieved Sergeant Kinsler and took over care of the victim. Officer Lovreta described the victim as "outraged and scared" and in "panic mode." He said the victim's shirt was torn and that she was "half naked." The victim told Officer Lovreta that she was sexually assaulted by a man she did not know.

MPD Lieutenant Melvin Amerson testified that he worked in the MPD Sex Crimes Unit in 2015 as an investigator. He said that he was called to Fieldstone Apartments on April 17, 2015, with Lieutenant Blue. By the time Lieutenant Amerson arrived, the victim had been transported to the Rape Crisis Center. Defendant signed a consent to search form for his apartment, and Lieutenants Amerson and Blue and two uniformed officers conducted the search. The officers were searching for several items that the victim had seen while she was in the apartment in order to verify that it was the same apartment where she was assaulted. Lieutenant Amerson stated that no one else was in the apartment.

On cross-examination, Lieutenant Amerson recalled that there may have been a second bedroom in the apartment but said that he did not recall any officers searching that second bedroom. He agreed that Defendant was cooperative with the search.

MPD Officer Charles Cathey testified that he worked with the Crime Scene Unit and was called to the Fieldstone Apartments. He photographed the apartment living room, a bedroom, and a bathroom and collected evidence. Officer Cathey placed the evidence in

sterilized envelopes, tagged the evidence, and put them in the "property and evidence room" at the police station. Officer Cathey explained that, once he turns evidence into the property and evidence room, he no longer has access to it, and the evidence can only be accessed by the investigator on the case. Officer Cathey testified that he did not see a wet towel in the bedroom or bathroom and that, if he had, he would have photographed and collected it as evidence.

Kristine Gable testified as an expert in sexual assault nurse examination that she worked as a sexual assault nurse examiner ("SANE") at the Shelby County Rape Crisis Center. She stated that she examined the victim on April 17, 2015, and that the victim was "quiet and cooperative" and that "she was controlling her emotions and then sometimes expressing them outwardly." The victim told Nurse Gable what happened, which Nurse Gable memorialized in her report. Nurse Gable read her report to the jury, and the report detailed the same events to which the victim testified. The victim reported to Nurse Gable that she had been diagnosed with bipolar disorder and depression, but Nurse Gable testified that she did not observe anything in the victim to indicate "mental instability."

Nurse Gable physically examined the victim, and she found an abrasion on the victim's "fossa navicularis," which is "a small cup-like area just outside the vagina[.]" She said that the injury was "acute, meaning it happened recently," but she could not give an exact time. Nurse Gable explained that it is very uncommon to find injuries in adult women after forced sex because estrogen makes the genital tissue "elastic and stretchy[,]" yet she did find an injury on the victim. Nurse Gable also noted that the victim's neck and right forearm were tender to touch. She concluded that the victim's injuries were consistent with the narrative the victim told her.

On cross-examination, Nurse Gable agreed that she could not identify whether the abrasion found in the victim's genital area occurred during consensual sex with her spouse the night before or whether it was due to forced penetration.

MPD Lieutenant Charles Mowery testified that he worked in the Sex Crimes Unit and that he was assigned as the case officer for the present case. He said that he spoke to the victim at the Rape Crisis Center and that she was "very quiet, very tired, and she was upset obviously." Lieutenant Mowery took the victim's formal statement and conducted a photographic lineup. He said that the victim identified Defendant "immediately." Later that day, Lieutenant Mowery met with Defendant, and Defendant signed a DNA sample release form. Lieutenant Mowery took four buccal swabs from inside Defendant's cheeks and entered the buccal swabs into the property and evidence room.

Lieutenant Mowery testified that a clinician from the Rape Crisis Center took penile swabs from Defendant while Lieutenant Mowery was present. He stated that he took

custody of the penile swabs from the clinician and placed them in the property and evidence room. Defense counsel objected to the admission of the penile swabs, and the following bench conference occurred:

> [DEFENSE COUNSEL]: My objection would be that he's not the one who did it. It's a clinician. [W]e can keep it as identity only until the clinician will verify that they took the -- they're the ones that did the swabbing.

> [TRIAL COURT]: [Defense counsel], [Lieutenant Mowery] indicated he was present when the clinician took the swab and he got it from the clinician, that he actually tagged it and put it in this property and evidence envelope. For chain of custody purposes, the person who actually took the swab doesn't have to be here as long as he testified that he was present, that he saw it collected, and that he did, in fact, tag it and place it in this property and evidence envelope. . . . And all those questions regarding chain of custody actually end at that process unless there's some legitimate indication that, "Judge Coffee, I think this has been tampered with."

The trial court overruled the objection to the chain of custody of the penile swabs. Lieutenant Mowery testified that he "believed" he was the person to take the penile swabs to the property and evidence room.

On cross-examination, Lieutenant Mowery stated that "more often than not," he was the one to deliver penile swabs to the property and evidence room. He continued, "With [Defendant] still being there, perhaps another detective in the . . . Sex Crimes office would have done that." When asked if a crime scene officer may have taken the penile swabs to the property and evidence room, Lieutenant Mowery said no but that it was possible he handed it to an "investigator."

Lindsey Flores testified that she worked in the MPD Sex Crimes Unit as a "criminalist." She stated that her job was to collect DNA, transport evidence to labs, and then back to the property room. Ms. Flores verified that she took custody of the evidence in the present case, which were in sealed envelopes, from the property and evidence room and transported them directly to the Tennessee Bureau of Investigation ("TBI").

Forensic Technician Samuel Frederick testified that he worked for the TBI Memphis Regional Crime Lab Evidence Receiving Unit. He stated that the TBI would not receive unsealed evidence. Agent Frederick recalled receiving the evidence from Ms. Flores in the present case, and he said that the evidence was "sealed and secure" when he received it.

Chalise Wilson testified as an expert in forensic DNA analysis. Ms. Wilson stated that she was working for Sorenson Forensics when she received the sealed evidence in this case from the TBI. In doing DNA analysis, Ms. Wilson tested the victim's pants and swabs, a used condom, and Defendant's buccal and penile swabs. Ms. Wilson testified that the laboratory did not receive a reference sample from the victim's husband for comparison. Semen was found in the victim's vulva swab, and three individuals contributed to the mixture found. An unknown male, which Ms. Wilson labeled "unknown male number one," was found to be the major contributor. However, she could not determine whether Defendant was also a contributor. Ms. Wilson described the profile of the third contributor as "inconclusive."

When Ms. Wilson tested the condom, she found the victim's DNA on the "apparent outside" of the condom. Defendant's DNA was not the major contributor for the "apparent outside" of the condom, but the testing could not exclude him. Testing on the "apparent inside" showed DNA attributable to the victim and two other contributors, including "unknown male number one," but Defendant was excluded from this mixture.

Testing showed two contributors to the sperm from Defendant's penile swab, one belonging to "unknown male number one" and the other found to be inconclusive. Ms. Wilson explained that the same unknown individual's DNA that was found in Defendant's penile swab was also found in the victim's vulva swab and found on the used condom. She stated that, on occasion, she finds a "male's profile on another male's penis." Ms. Wilson agreed that, "if that's the condom that was used to penetrate the victim by the attacker after she'd had sex with her husband, . . . these [are] findings consistent with what [she] would expect to see[.]"

Defense Proof

Dedrek Thomas testified that, in April 2015, he was living in the Fieldstone Apartments with Defendant. He said that the apartment he shared with Defendant had two bedrooms and that the walls were "paper thin." Mr. Thomas said that both he and Defendant had a "scan card" to be able to get into the apartment complex gate. He testified that he did not let Defendant in on the morning of April 17, 2015, because Defendant had his own scan card for the gate and key for the apartment. Mr. Thomas recalled that, in the early morning of April 17, 2015, Defendant woke Mr. Thomas when he knocked on his bedroom door and asked for a condom. He said that he gave a condom to Defendant but that he never heard a woman in the apartment that morning. Mr. Thomas explained that, later that morning, he was called at work and asked to return to the apartment to speak to police and that he did so.

On cross-examination, Mr. Thomas said that he and Defendant had been friends for "almost [forty] years," since childhood. He did not recall what time Defendant woke him to ask for a condom, and he did not recall whether Defendant left the apartment and later returned. Mr. Thomas agreed that he never made a statement to police and never approached the district attorney's office to make a statement. Mr. Thomas agreed that he had prior convictions for murder, larceny, aggravated assault, and DUI.

Defendant testified that, in April 2015, he lived with Mr. Thomas in the Fieldstone Apartments. He said that he was working at a factory through a temporary agency and that he was "off Thursdays and Fridays[.]" He said that, on Thursday night, April 16, 2015, he went to a club about 10:30 p.m. and left at about 2:30 a.m. the next morning. Defendant recalled that he stopped at a gas station on the way home, that he bought some gas and a cigar, and got back in his truck. He explained that, as he prepared to leave the gas station, he saw the victim walking across the parking lot and called out to her. Defendant testified:

> So she c[a]me to the car. I'm like, "What's up? Where you going?" She said she was going to her cousin['s] house or something like that. I said, "You want to come kick it with me?" She's like, "Yeah." She jumped in the car. She got in the car voluntarily. . . . I had [a] 2002 Chevy 1500 truck.

Defendant said that the victim got into the truck through the passenger's side door and that he did not grab her or try to force her. He stated that, on the drive to his apartment, he told her his name was "Sean," and she told him her name was "Teresa." He said that he told the victim he had served sixteen years in prison for murder and that, even with his criminal record, it was not difficult for him to find a job. Defendant said that he had to stop at several stop lights on the way to the apartment. He explained that the doors of the truck worked properly and that the victim could have gotten out of the truck whenever it was stopped. He recalled that he used his scan card to enter the apartment complex gate. When they arrived at the apartment, Defendant told the victim that his nephew was asleep in the living room, so she should not make too much noise.

Defendant testified that, when they entered the apartment, the victim asked him if she could take a shower and that he said, "yes." He said that he gave the victim a towel and soap, left the bathroom, and closed the door. He recalled that he took off his shoes and shirt and then realized he did not have a condom. Defendant said that he woke Mr. Thomas to ask for a condom and that Mr. Thomas gave him two condoms. Defendant testified that he waited on the bed until the victim came out of the shower with a towel wrapped around her. The victim asked Defendant to put her phone on the charger, and he did so. He said that the victim went to the other side of the bed and removed her towel. Defendant stated that he "pulled [his] pants off and [his] underwear off and grabbed a condom." He recalled that the victim took the condom from him and put it on him. He said, "She put the condom

- 10 -

on, started giving me oral sex. . . . I got on top of her and started having sex with her. She was moaning. We were having sex."

Defendant recalled that, after "about a minute," the victim asked him to stop and told him that he needed to give her money. He said that he told the victim, "I ain't got no money. No, I ain't going to give you no money." Defendant explained that the victim got off the bed. He said that no one ever knocked on the door and that the victim never yelled.

The victim asked Defendant for her phone, and he gave it to her. Defendant said that the victim went into the bathroom and that he put on his pajama pants and house shoes. He stated that the victim never came out of the bathroom and that he could not find her in the apartment. He said that he grabbed his keys and left the apartment without his shirt. He explained, "I don't want nobody like that running around these apartments because I got Sher[]iff's officers like these in here that they right in the next building beside me with their cars parked outside. I got an officer that stay right above me."

Defendant said that he saw the victim near the shopping center and that he asked her if he could drop her off. He said that the victim again asked for money and said that she would "get [her] own ride." Defendant stated that he returned to the apartments at that point but that he did not have his gate key with him, so he had to wait outside the gate. Defendant said that he waited a long time to see if another car would open the gate and that he fell asleep waiting.

Defendant stated that two police officers "snatched" him from his truck, "threw [him] down, put handcuffs on [him]," and that one officer put her foot on his neck. After he waited in a police car for some time, an officer asked him to sign a consent to search form for his apartment, and he consented to the search.

Defendant denied that he grabbed the victim or told her that he was going to "snap her neck." He denied that he told the victim that he was not afraid of going back to prison because he was, in fact, "terrified to go back to jail."

On cross-examination, Defendant agreed that, when he was eighteen and was arrested for drugs, he told the police his name was "Antwon Rainer," which is his brother's name. He agreed that the victim was small and that he was "6 [feet] one [inch]" tall, weighed about 230 pounds, and was approximately twice the size of the victim. Defendant denied that he forcibly raped the victim and explained that, if the victim had been yelling or trying to get him to stop, "a lot of people would have heard." Defendant agreed that, in April 2015, he told police that the victim "was moaning loudly" and that she "screamed." Defendant denied telling any officers on the scene that he did not have sex with the victim. He said that he did not make any statements to the officers on the scene. Defendant agreed

that, when he gave his statement at the police station, he did not tell the officers that the victim asked for money. He agreed that officers did not place into evidence a wet towel from his bedroom or bathroom and that Officer Cathey testified that no wet towel was present.

## State's Rebuttal Proof

Officer Lovreta testified that, when he pulled Defendant from his truck, Defendant said, "I'm not drunk. . . . I'm just sleeping." He said that Defendant told officers that he was "looking for a female, a girl he met in Orange Mound." Officer Lovreta explained that no one asked Defendant any questions on the scene and that Defendant volunteered those statements.

Sergeant Kinsler testified that, when he approached Defendant in his truck,

Defendant said, "Look man, I know y'all think I'm drunk. I'm just out here looking for my friend. She ran out of the apartment, screaming, and I've been looking for her all night. I'm just tired, so I was taking me a little nap. . . . I met this girl. She was walking. She asked to get in my truck. I let her into my apartment. She got to my apartment. She asked to take a shower. She took a shower; she came out of the shower. She laid down beside me for about ten minutes, then all of a sudden she just started screaming. I grabbed her by her shoulders. I'm like, "What's wrong with you? What's wrong with you?" And he said she grabbed her clothes and she ran out of the apartment.

Defendant told officers on the scene that he did not have sex with the woman he picked up, and he did not say the woman asked for money. Sergeant Kinsler explained that Defendant voluntarily offered those statements without any questions from police. Sergeant Kinsler testified that, when Defendant's truck was towed and inspected, officers discovered that the truck's door handle was missing.

Lieutenant Mowery testified that he took Defendant's statement at the police station. He said that he advised Defendant of his *Miranda* rights and that Defendant signed a waiver of those rights prior to answering questions and making a statement. Lieutenant Mowery stated that Defendant never said that the victim asked him for money.

Lieutenant Mowery read Defendant's statement to the jury. In part, it stated that, after the victim "ran out of the door, naked," Defendant followed her in his truck to see if she needed a ride home. It continued, "[S]he started really screaming like something was

wrong with her. Because she was screaming so loud, I drove off to the front of the apartments."

Following deliberations, the jury convicted Defendant of rape in count one and aggravated kidnapping in count two.

*Sentencing and Motion for New Trial*

In 2016, prior to Defendant's first trial, the State filed a notice to seek enhanced punishment as a repeat violent offender due to Defendant's two 1994 felony convictions, one for second degree murder and one for attempted first degree murder. At Defendant's sentencing hearing, the trial court reviewed the presentence report and Defendant's 1994 convictions and found that both of Defendant's 1994 felonies qualified as "violent offenses" for the purposes of the repeat violent offender statute. The court stated that each of Defendant's two prior convictions was a "separate period of incarceration." Thus, the trial court sentenced Defendant to life without the possibility of parole in counts one and two.

The trial court further noted that the offenses in the present case occurred while Defendant was released on parole. It found that, since Defendant's release on parole, he had also been arrested for several driving violations and had served eleven months and twenty-nine days for a DUI conviction. It stated that Defendant was assessed as a high risk for repeat violent offenses. In considering the discretionary consecutive sentencing factors, the trial court found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation in committing a crime with a high risk to human life. It stated,

> This young woman was snatched off the streets at 5:00 in the morning, 4:30 in the morning, taken to a location where she is held against her will, threatened with death, was told, if she resisted, if she said anything, he would kill her, and that he had just got[ten] out of prison, and that he was not afraid to go back to prison.

The trial court stated that the circumstances surrounding the events were aggravated and that confinement for an extended period of time was necessary to protect the community because Defendant "has shown that, when he is not in prison, that he will, in fact, commit crimes[.]" The trial court also found that mandatory consecutive sentencing applied because Defendant was released on parole at the time of the offenses. Thus, the trial court ran the two sentences consecutively to each other and to Defendant's sentence for a parole violation.

Defendant filed a timely motion for new trial, which the trial court denied. Defendant now timely appeals.

## Analysis

Defendant argues (1) that the trial court erred by admitting hearsay evidence, (2) that the chain of custody for Defendant's penile swabs was not properly established, (3) that the evidence was insufficient to support the convictions, and (4) that the trial court erred by imposing excessive sentences.

The State responds (1) that the trial court properly found the victim's statement to be non-hearsay, (2) that the chain of custody for the penile swabs was sufficiently established, (3) that the evidence was sufficient to support Defendant's convictions for rape and aggravated kidnapping, and (4) that Defendant's sentences were not excessive.

*I. Hearsay*

Defendant argues that the trial court improperly permitted Sergeant Kinsler to testify about the victim's statement to Officer Beaty, which Officer Beaty then relayed to Sergeant Kinsler, that Defendant's truck was parked at the entrance gate to the apartment complex. Defendant contends that the victim's statement was inadmissible hearsay because it "was used to show [that Defendant] was actually sitting inside his truck at the apartment complex" and was, therefore, used to prove the truth of the matter asserted.

The State responds that the trial court did not abuse its discretion because the statement was non-hearsay.

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802.

In *Kendrick v. State*, our supreme court addressed the standard of review applicable to the review of hearsay statements:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear

testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.2d [739], 759-61 [(Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule— are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

454 S.W.3d 450, 479 (Tenn. 2015).

Declarations are non-hearsay when they are used to prove the effect on the hearer:

[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair do not fall within the hearsay exclusion. The statement fails the test of hearsay because it is not used to prove the truth of the matter asserted in the statement.

NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE, § 8.01[7], at 8-23 (5th ed. 2005)); *see also State v. Venable*, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980) (noting that the victim's statement was not hearsay because it was offered for its effect on the hearer, the defendant, and established evidence of his motive in returning to the scene of the crime later in the day and threatening the victim); *State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App. Sept. 30, 2010), *perm. app. denied* (Tenn. Mar. 9, 2011) (concluding that declarant's statements were non-hearsay and were properly admitted to prove the effect they had on the hearer).

Here, Sergeant Kinsler testified that Officer Beaty told him over the radio that the victim had identified Defendant's truck parked by the entrance gate of the apartment complex. Trial counsel objected to the admission of this statement as hearsay, and the trial court ruled that it was not offered for the truth of the matter asserted -- that the truck belonged to Defendant and was used in the victim's kidnapping -- but rather was offered to show that the victim's statement caused Sergeant Kinsler to approach the vehicle and arrest Defendant. The trial court explained to the jury:

[I]f it's not being offered for the truth of the matter asserted, then that statement can come in to show what effect it had on [Sergeant] Kinsler and what he did as a result of the information that he received. It's not being

offered to say that's true, but of what [Sergeant Kinsler] received and what he did when he received that information.

We agree that the statement was non-hearsay and was used to show the statement's effect on the hearer, Sergeant Kinsler. *See State v. Darrin Bonner*, No. W2007-02409-CCA-R3-CD, 2009 WL 1905420, at *7 (Tenn. Crim. App. July 2, 2009) (finding that "the testimony regarding the report of a stolen vehicle was not offered to prove that a theft actually occurred [but] was offered to prove the effect it had on the officers upon hearing it"). Moreover, the statement was relevant because, without the context provided by this statement, it would have been unclear to the jury why Sergeant Kinsler approached Defendant's vehicle and arrested him. *See State v. Marvin Wendell Kelley*, No. M2011-02260-CCA-R3-CD, 2013 WL 5827646, at *10 (Tenn. Crim. App. Oct. 29, 2013) (finding that the victim's father's testimony of out-of-court statements was non-hearsay because the statements were offered to provide context for the victim's father's subsequent actions); Tenn. R. Evid. 401.

Finally, even if the admission of the statement was error, it was harmless. The identity of Defendant was not at issue in this case; the only issue was consent. Therefore, whether the victim identified Defendant at the scene had no bearing on Defendant's defense of consent and would not have affected the outcome of the trial. *See State v. Dejavone Lee Woods*, No. M2020-00114-CCA-R3-CD, 2021 WL 3355498, at *7 (Tenn. Crim. App. Aug. 3, 2021) (finding that "the admission of the victim's hearsay statement that the shooter was a 'black male' was harmless because the [d]efendant did not contest his involvement with the shooting"). Defendant is not entitled to relief.

## II. Chain of Custody

Defendant argues that the trial court erred by admitting evidence of the penile swabs without establishing every link in the chain of custody. He submits that it was improper to allow Lieutenant Mowery to testify that he witnessed the clinician take the swabs of Defendant and that he then took the swabs to the property room. Defendant contends that the clinician herself should have been required to testify that she took the swabs and handed them to Lieutenant Mowery. Moreover, Defendant argues that Lieutenant Mowery could not definitively state that he was the person to take the penile swabs to the property room. Defendant asserts that "it is the best practice for every link in the chain of custody to testify, or at least someone needs to discuss more specifics about what was done than what [Lieutenant] Mowery was able to provide."

Citing *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008), the State argues that it "reasonably establish[ed] the identity and integrity of the evidence" and, therefore, was not required to "call all of the witnesses who handled the item[.]"

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The Tennessee Supreme Court has previously recognized that it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (internal quotes omitted). "The purpose of the chain of custody requirement is 'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). Even though each link in the chain of custody should be sufficiently established, Rule 901(a) does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor is the State be required to establish facts which exclude every possibility of tampering. *Cannon*, 254 S.W.3d at 296 (citing *Scott*, 33 S.W.3d at 760). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence. *Id.* "Absent sufficient proof of the chain of custody, however, the 'evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means.'" *Scott*, 33 S.W.3d at 760 (quoting COHEN ET. AL., TENNESSEE LAW OF EVIDENCE § 901.12, at 624 (3d ed. 1995)).

We review challenges to the chain of custody of evidence under the abuse of discretion standard. *Cannon*, 254 S.W.3d at 295 (citing *Scott*, 33 S.W.3d at 752). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Here, the State sufficiently established the chain of custody of the penile swabs. While Lieutenant Mowery did not swab Defendant himself, he witnessed the Rape Crisis Center clinician take the swabs of Defendant's penis, and then he immediately took custody of the swabs. This testimony was sufficient to establish this link in the chain of custody. See *State v. Charles Raymond Sanders*, No. M2000-03083-CCA-R3-CD, 2002 WL 31051628, at *15 (Tenn. Crim. App. Aug. 30, 2002) (finding that the chain of custody was sufficiently established where an officer witnessed a nurse draw blood from the defendant and then the nurse handed the blood vials to the officer), *perm. app. denied* (Tenn. Dec. 23, 2002).

The other link in the chain of custody of which Defendant complains is that Lieutenant Mowery could not recall if he took the penile swabs to the property room himself or if he handed them to another detective or investigator to take to the property room. Lieutenant Mowery stated that, "more often than not," he took swabs to the property room himself. He said that, on occasion, he would hand swabs to another detective or investigator to take to the property room. Lieutenant Mowery stated that he would not give swabs to a crime scene officer. He testified that, after receiving the swabs from the clinician, he "tag[ged]" them "in[to] property and evidence." MPD criminalist Lindsey Flores stated that, when she checked out the swabs and other evidence from the property room to transport them to the TBI, the swabs were in a sealed condition. Ms. Flores stated that she gave the swabs and other evidence to TBI forensic technician Samuel Frederick. Agent Frederick stated that the TBI would not receive evidence that was not in a sealed condition and that the evidence in this case was "sealed and secure" when he received it from Ms. Flores. This was sufficient to establish the chain of custody for the penile swabs. *See State v. William Radley*, No. 01C01-9502-CC-00045, 1995 WL 687697, at *2 (Tenn. Crim. App. Nov. 21, 1995) (finding a sufficient chain of custody where "the laboratory technician from the [TBI] did not testify as to the condition of the seal at the time the evidence arrived at the crime laboratory" but where a TBI forensic chemist testified that "the policy of the crime lab is not to receive evidence unless it is properly sealed[.]"). The trial court did not abuse its discretion in admitting the penile swabs, and Defendant is not entitled to relief.

### III. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his convictions for rape and aggravated kidnapping. He asserts that his testimony showed that the sexual intercourse with the victim was consensual. He also contends that his testimony shows that the victim got into his truck voluntarily.

The State responds that the evidence was sufficient for a rational trier of fact to find Defendant guilty of rape and aggravated kidnapping.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d

370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

## A. Rape

As pertinent here, rape is the "unlawful sexual penetration of a victim by the defendant" where "[f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1) (2015). "'Coercion' means threat of kidnapping, extortion, force or violence to be performed immediately or in the future[.]" Tenn. Code Ann. § 39-13-501(1) (2015). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2015).

Here, the victim testified that Defendant forced her to perform oral sex on him and that Defendant vaginally penetrated her. Defendant agreed that he orally and vaginally penetrated the victim. The victim said that Defendant had threatened to "snap her neck," that he had previously been incarcerated for murder, and that he was "not afraid to go back" to prison. Defendant also testified that he told the victim that he had been incarcerated for sixteen years for murder. Nurse Gable testified that the victim suffered an injury to her genitals consistent with the victim's narrative of forcible sex. Further, after the victim escaped, she was found naked in the road waving down cars while on the phone with police. Several witnesses testified that the victim's shirt was ripped. The credibility of witnesses is resolved by the jury, and the jury clearly accredited the victim's testimony. *Bland*, 958 S.W.2d at 659. The evidence was sufficient to establish that Defendant used force and coercion to sexually penetrate the victim.

## B. Aggravated Kidnapping

As pertinent here, aggravated kidnapping is false imprisonment committed "to facilitate the commission of any felony or flight thereafter[.]" Tenn. Code Ann. § 39-13-304(a)(1) (2015). "A person commits the offense of false imprisonment who knowingly

removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2015). "'Unlawful' means, with respect to removal or confinement, one that is accomplished by force, threat or fraud[.]" Tenn. Code Ann. § 39-13-301(15) (2015). "'Coercion' means [c]ausing or threatening to cause bodily harm to any person, physically restraining or confining any person[,] or threatening to physically restrain or confine any person." Tenn. Code Ann. § 39-13-301 (3)(A) (2015).

Here, the victim testified that Defendant approached her and placed his arm around her neck, threatening to "snap her neck." Defendant agreed that he weighed approximately two times the amount that the victim weighed. The victim said that Defendant physically pushed her into the driver's side of his truck and that the truck's passenger door was nonfunctional, so she could not escape. The victim said that Defendant told her he had been incarcerated for sixteen years for murder and that he was "not afraid to go back." The victim said that, once they arrived at the apartment complex, Defendant again put his arm around her neck and dragged her into his apartment, where he raped her. The evidence was sufficient to establish that Defendant removed and confined the victim, using force and threats, so as to interfere substantially with her liberty. Moreover, the evidence was sufficient to establish that Defendant did so in order to facilitate rape, as discussed above. The credibility of witnesses and weight of the evidence are resolved by the jury, and we will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief.

## IV. Sentencing

Defendant argues that the trial court erred in imposing excessive sentences. He argues that both of his convictions are Class B felonies and, therefore, do not warrant sentences of life without the possibility of parole. Defendant does not challenge his status as a repeat violent offender and does not challenge the consecutive alignment of his sentences.

The State responds that Defendant's status as a repeat violent offender mandated sentences of life without the possibility of parole. It states that consecutive alignment of the sentences was proper because Defendant was on parole at the time of the offenses and because the trial court properly found Defendant to be a "dangerous offender."

Citing Tennessee Code Annotated section 40-35-401(d) (2020), Defendant argues that this court should review his sentences *de novo*. However, in *State v. Bise*, 380 S.W.3d 682, 707-708 (Tenn. 2012), our supreme court found that *de novo* review, as written in section 40-35-401(d), was in conflict with United States Supreme Court precedent. The court in *Bise* held that, when the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and

principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Id.* The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

However, in this case, the lengths of Defendant's sentences were mandatory. Tenn. Code Ann. § 40-35-120(g) (2020). A trial court cannot abuse its discretion by imposing an excessive sentence where, by statute, the trial court has no discretion. *See Landon Conner Keith v. Commonwealth*, No. 0694-17-3, 2018 WL 2106497, at *2 (Va. Ct. App. May 8, 2018) ("[A] court cannot abuse its discretion when there is no discretion permitted by the statute to abuse."); *see also State v. Manuel Armando Reyna, Jr.*, No. 2 CA-CR 2014-0039, 2015 WL 1394754, at *3 (Ariz. Ct. App. Mar. 26, 2015) ("A court cannot abuse discretion that it does not possess."). Therefore, the only question for this court to review regarding sentencing is whether the trial court properly classified Defendant as a repeat violent offender for both convictions, which in turn required mandatory sentences of life without the possibility of parole. Tenn. Code Ann. § 40-35-120(g) (2020).

"The State bears the burden of establishing beyond a reasonable doubt that the defendant possesses the requisite number of prior felonies to qualify for a particular range." *State v. Joseph Cordell Brewer, III*, No. W2014-01347-CCA-R3-CD, 2015 WL 4060103, at *7 (Tenn. Crim. App. June 1, 2015) (citing *State v. Jones*, 901 S.W.2d 393, 397 (Tenn. Crim. App. 1995)). If the trial court's determination that Defendant was a repeat violent offender is supported by the record, then the sentence of life without the possibility of parole is mandatory. Tenn. Code Ann. § 40-35-120(g) (2020).

As pertinent here, a "repeat violent offender" is a defendant who "[i]s convicted in this state on or after July 1, 1995, of any offense classified in subdivision (d)(1) as a violent offense; and [h]as at least one (1) prior conviction for an offense classified in subdivision (d)(1) or (d)(2) as a violent offense[.]" Tenn. Code Ann. § 40-35-120(a)(5), (6) (2020). Tennessee Code Annotated section 40-35-120(d)(1) states that, for purposes of subdivisions -120(a)(5) and (a)(6), second degree murder, aggravated kidnapping, and rape are "violent offenses." Tenn. Code Ann. § 40-35-120(d)(1)(B), (H), (I) (2020). "The court shall sentence a defendant who has been convicted of any offense listed in subdivision . . . (d)(1) to imprisonment for life without possibility of parole if the court finds beyond a reasonable doubt that the defendant is a repeat violent offender as defined in subsection (a)." Tenn. Code Ann. § 40-35-120(g) (2020).

Here, the State's notice to seek enhanced punishment listed two of Defendant's prior convictions, one for attempted first degree murder and one for second degree murder, and the trial court relied on these convictions for its classification of Defendant as a repeat violent offender. Both the presentence report and Defendant's 1994 judgments of

conviction were entered as exhibits to the sentencing hearing, and both showed that Defendant was convicted in 1994 of second degree murder. Only one prior violent offense listed in subsection 40-35-120(d)(1) is necessary for repeat violent offender classification under subsection 40-35-120(a)(6), and second degree murder is a violent offense for that subdivision. Tenn. Code Ann. § 40-35-120(d)(1)(B) (2020). Moreover, Defendant was convicted in the present case of aggravated kidnapping and rape, both of which are enumerated as violent offenses under subsections 40-35-120(d)(1)(H) and (I). Thus, the trial court properly determined that Defendant was a repeat violent offender for both of the present convictions.

Once the trial court found beyond a reasonable doubt that Defendant was a repeat violent offender, Tennessee Code Annotated section 40-35-120(g) required the trial court to sentence Defendant to life without the possibility of parole. Tenn. Code Ann. § 40-35-120(g); *see Stubbs v. State*, 393 S.W.2d 150, 154 (1965) ("[W]hen the word 'shall' is used in constitutions or statutes[,] it is ordinarily construed as being mandatory and not discretionary."). Moreover, the trial court had no discretion in the consecutive alignment of sentences because Defendant committed the present offenses while on parole. Tenn. R. Crim. P. 32(c)(3)(A). Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE